Filed 4/8/21  P. v. Ayala CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304033 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA470114) |
| v. | |
| JAMAINE MARTELL AYALA, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael D. Abzug, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Eric E. Reynolds, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jamaine Martell Ayala appeals from a judgment entered after a jury found him guilty of corporal injury upon a spouse, criminal threats, and felony vandalism. The jury also found true the special allegation that he personally used a firearm in the commission of the criminal threats. The trial court sentenced him to six years in prison. He contends the trial court abused its discretion in declining to sentence him to probation due to his posttraumatic stress disorder (PTSD) stemming from his service in the United States military, as provided in Penal Code section 1170.9.[1] He also contends the trial court abused its discretion in imposing an upper term sentence, without considering his service-related PTSD as required under section 1170.91. We reject the first contention. As to the second, we remand the matter for a new sentencing hearing because the record does not demonstrate the trial court complied with its statutory obligations under section 1170.91.

## BACKGROUND

### I. Prosecution Case

#### A. Evidence of charged offenses

Ayala and his wife Rose married in February 2016. At the time of the charged incident in June 2018, they lived in a rented, two-bedroom apartment in Los Angeles, and Rose was seven months pregnant with their first and only child. When Rose testified at trial, she explained that she and Ayala (who was out of custody on bail), were legally separated.

On June 17, 2018, the date of the charged offenses, Ayala and Rose argued when she confronted him with evidence of his infidelity as he lay in bed, using his cell phone. Rose recorded

_____

[1] Further statutory references are to the Penal Code.

2

audio of the argument on her cell phone because she believed Ayala would admit the infidelity and she could play the audio at their next couple's counseling session. According to Rose's testimony, Ayala did not know Rose was recording the incident. The prosecution played the audio for the jury during Rose's testimony and provided transcripts of the audio for the jury's review.[2] The audio captured the words spoken during the argument and the sounds of the altercation (e.g., punches to the wall, glass breaking, and thuds), as described below.

During the argument, Ayala got out of bed and punched two holes in a bedroom wall. Using profanity, he yelled at Rose and told her he hated her multiple times. Ayala, who was six feet six inches tall and weighed around 240 pounds, lifted Rose off the ground by placing his arms underneath her shoulders and "slammed [her] down on the floor," according to Rose's testimony.[3] She landed on her buttocks, in a seated position, hitting a large box containing an unbuilt crib, which pressed into her ribs. Ayala grabbed her by her hair and dragged her a couple feet. He let her go and left the room.

As Ayala walked to the other bedroom, he broke items in the kitchen (e.g., fruit bowls) and some of Rose's glass bottles of perfume in the bathroom. Rose followed him, and they continued

---

[2] In his opening appellate brief, Ayala contended the trial erred in admitting into evidence the audio recording of the altercation. After reviewing the Attorney General's respondent's brief, and the authorities cited therein, Ayala expressly abandoned this contention in his appellate reply brief, conceding there was no error.

[3] Rose was five feet five inches tall and seven months pregnant.

to argue, with him repeating multiple times that he hated her. He told her to "[g]et up out of [his] face," as reflected on the audio recording.  Then, he threatened to punch her in the face.

Ayala began packing his belongings to leave the apartment. He grabbed his semiautomatic firearm from a bedroom closet. Rose testified that Ayala kept the gun loaded with the safety off, so he was ready to fire at an intruder.  As they continued to argue, and as Ayala was holding the gun, he said, "I'm going to shoot you in the fucking face," as reflected on the audio recording. According to Rose's testimony, Ayala was standing less than 10 feet away from her, facing her, and pointing the gun toward the floor at a 45-degree angle.  Rose asked him to put down the gun. He told her multiple times to get out of his face.  He placed the gun on the counter where he was gathering his belongings, as he packed.  Rose asked him why he had the gun, and he replied, "Shoot you if you don't get the fuck away from me," as reflected on the audio recording.  Rose was scared because of Ayala's temper and his "experience" in the military.

After she stopped recording the incident, Rose left the apartment.  The same day, she went to a police station and reported the incident, and an officer took photos of her injuries. Her injuries included bruises on her arm, swelling around her ribs, broken capillaries on her chest, and pain all over her body. She also developed hemorrhoids and sciatica which she attributed to Ayala slamming her down on her buttocks.  The prosecutor showed the jury photos that Rose took of her bruised arm and broken capillaries and a photo the officer took of her bruised arm.[4]

---

[4] The officer testified at trial.

Rose did not have contact with Ayala for the remainder of her pregnancy.  In October 2018, after their son was born, she met with him so he could meet his child and they could sign documents to finalize their separation.  She was not scared on that occasion because Ayala "was really sweet" to her.  Thereafter, he asked her to have the charges against him dropped and move with their son to Miami where he was living.  She considered talking to the detective about dropping the charges, and she told Ayala she was considering it.  But sometime later, during another phone call, Ayala became angry and snapped at her, and she decided to participate in this case.

**B.     Evidence of uncharged domestic violence**

Rose testified about an uncharged incident of domestic violence with Ayala that occurred just after they were married in 2016, when they were living in Florida.  She confronted him about his infidelity.  They argued.  He threw her onto the ground, causing bruising on her legs and stomach.  The prosecutor showed the jury photos of bruising on Rose's legs and stomach that Rose testified was caused during this incident.

As Rose and Ayala continued to argue after Ayala threw her to the ground during this uncharged incident, Rose showed Ayala messages on her iPad evidencing his infidelity.  He grabbed the iPad from her hands and threw it out the window and over the balcony.  According to Rose's testimony, Ayala gave her a look, which scared her, so she punched him in the lip, causing bruising and swelling on his lip.  The prosecutor showed the jury a photo of Ayala's swollen lip that Rose testified resulted from her punching him during this uncharged incident.

5

## II.    Defense Case

Appellant testified in his defense.  He stated the June 17, 2018 incident began when Rose came into the bedroom where he was sleeping and started hitting him and accusing him of infidelity.  He went to the other bedroom, and Rose left the apartment.  When she returned to the apartment, she woke him up again by slapping him.  She continued to accuse him of infidelity as she sat on the bed where he was lying, pushing him multiple times with her hand.

Ayala stated he got out of bed and "hit the wall twice out of frustration," causing holes in the wall.  Rose stood in front of him and tried to stop him from walking out of the bedroom.  He pushed her to the side and went to the other bedroom to pack his belongings.  When he returned, Rose was sitting on the floor, crying.  He denied he picked her up and slammed her to the ground.  He stated he grabbed her by her arms to help her up to her feet.  He then referenced the audio recording and testified that when Rose was saying "stop" and "get off me," it was because she did not want him to touch her or help her up.  He denied he pulled her hair.  He again left the room and went back to packing his belongings.

Ayala admitted during his testimony that he broke some of Rose's perfume bottles "[o]ut of frustration."  He also admitted he threatened to shoot her in the face, but he stated it was just "an expression" and "an empty threat" he made because he was "frustrated" and "angry," and it was the "[f]irst thing that came to mind."  He denied he was holding the gun when he threatened to shoot her; he stated he had already put it on the counter.  He also denied the gun was loaded.  He stated he was taught in the military "to not have a fully loaded automatic weapon in the

6

home off safety.  Because if that weapon is to fall, it will fire no matter what."  He reiterated that he was frustrated, stating that Rose was following him around the apartment, putting her hands in his face, and accusing him of infidelity.  He also denied that he wanted to punch Rose in the face at the time he threatened to punch her in the face, as reflected on the audio recording.

Regarding the 2016 uncharged incident of domestic violence, Ayala denied he threw Rose down, but he admitted he threw her iPad out the window and over their fifth floor balcony. Rose punched him in the face.  He stated he never became angry during that incident, even after she punched him in the face.

During cross-examination, the prosecutor asked Ayala if Rose was "making it up" when she asked him to put the gun down, as reflected on the audio recording.  Ayala responded: "Yes.  She made up a lot of things."

### III.  Verdicts and Sentence

The jury found Ayala guilty of corporal injury upon a spouse (§ 273.5, subd. (a)), criminal threats (§ 422, subd. (a)), and felony vandalism with damage over $400 (§ 594, subd. (a)).[5]  The jury also found true the special allegation that Ayala personally used a firearm in the commission of the criminal threats. (§ 12022.5, subd. (a).)  The jury found Ayala not guilty of assault with a firearm.  (§ 245, subd. (b).)

The trial court sentenced Ayala to six years in prison:  the upper term of three years for criminal threats, plus the lower term of three years for the firearm enhancement.  The court imposed concurrent terms for corporal injury upon a spouse and

---

[5] The prosecution presented evidence demonstrating that the damage (holes in the walls and broken bottles of expensive perfume) exceeded $400.

7

vandalism.  We set forth in more detail below the parties'
arguments and the trial court's findings and conclusions as to the
sentencing issues raised on appeal.

## DISCUSSION

Ayala contends the trial court abused its discretion in
declining to sentence him to probation due to his PTSD stemming
from his service in the United States military, as provided in
section 1170.9.  He also contends the trial court abused its
discretion in imposing an upper term sentence, without
considering his service-related PTSD as required under section
1170.91.

Section 1170.9 provides, in pertinent part:

"(a)  In the case of any person convicted of a criminal
offense who could otherwise be sentenced to county jail or state
prison and who alleges that he or she committed the offense as a
result of . . . post-traumatic stress disorder . . . stemming from
service in the United States military, the court shall, prior to
sentencing, make a determination as to whether the defendant
was, or currently is, a member of the United States military and
whether the defendant may be suffering from . . . post-traumatic
stress disorder . . . as a result of his or her service.  The court may
request, through existing resources, an assessment to aid in that
determination.

"(b)(1)  If the court concludes that a defendant convicted of
a criminal offense is a person described in subdivision (a), and if
the defendant is otherwise eligible for probation, the court shall
consider the circumstances described in subdivision (a) as a factor
in favor of granting probation.

"(2)  If the court places the defendant on probation, the
court may order the defendant into a local, state, federal, or

8

private nonprofit treatment program for a period not to exceed that period which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists."

Section 1170.91, subdivision (a) provides, in pertinent part: "If the court concludes that a defendant convicted of a felony offense is, or was, a member of the United States military who may be suffering from . . . post-traumatic stress disorder . . . as a result of his or her military service, the court shall consider the circumstance as a factor in mitigation when imposing a term under subdivision (b) of Section 1170." Under section 1170, subdivision (b), "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime."

## I. Proceedings Below

### A. Sentencing memoranda

#### 1. Prosecution's sentencing memorandum

In its sentencing memorandum, filed September 3, 2019, the prosecution stated that the trial court could impose a maximum sentence of 14 years and eight months in prison for Ayala's offenses: the upper term of three years for the criminal threats, plus the upper term of 10 years for the firearm enhancement under section 12022.5, subdivision (a); a consecutive term of one year (one-third the middle term) for the corporal injury upon a spouse; and a consecutive term of eight months (one-third the middle term) for felony vandalism. The prosecution recommended the trial court instead sentence Ayala to seven years and eight months in prison: the same sentence

9

outlined above, except the lower term of three years for the firearm enhancement.

In urging the trial court to impose the upper term for the criminal threats, the prosecution cited the following circumstances in aggravation: (1) "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness" (Cal. Rules of Court, rule 4.421(a)(1));[6] (2) "The defendant was armed with or used a weapon at the time of the commission of the crime" (rule 4.421(a)(2)); (3) "The victim was particularly vulnerable" (rule 4.421 (a)(3)) in that Rose was seven months pregnant when Ayala committed the offenses; and (4) "The defendant has engaged in violent conduct that indicates a serious danger to society" (rule 4.421(b)(1)). The prosecution cited one circumstance in mitigation: Ayala's minimal criminal record. (Rule 4.423(b)(1).) As set forth in the probation report, Ayala's criminal history before the current offenses consisted of two out-of-state convictions: driving under the influence of alcohol in 2011 and driving while his license was suspended or revoked in 2012.[7]

The prosecution attached to the sentencing memorandum a letter from Rose, describing the continuing effects of the offenses

---

[6] Undesignated rule references are to the California Rules of Court.

[7] The probation officer recommended the trial court impose an upper term sentence in this case, finding no circumstances in mitigation and listing two circumstances in aggravation (the first and third circumstances in aggravation the prosecution included in its sentencing memorandum, as set forth above).

10

upon her, including anxiety, sciatica, and concerns for her safety and the safety of her and Ayala's son due to Ayala's behavior.

## 2. Ayala's sentencing memorandum

At the outset of his sentencing memorandum, filed September 5, 2019, Ayala explained he suffers from PTSD that is "70% connected to his [military] service," as evidenced by service-related documents he attached to the memorandum. Based thereon, he requested the trial court place him on probation and order treatment as provided in section 1170.9 (quoted above, in pertinent part). He also cited rule 4.410(a)(8), which states that one of the "[g]eneral objectives of sentencing" is "[i]ncreasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices," such as the programs and practices offered through Veterans Court.

In listing circumstances in mitigation in his sentencing memorandum, Ayala argued he is not a threat to society. He pointed out that "[p]rotecting society" is another general objective of sentencing, as set forth in rule 4.410(a)(1). He explained he had not been charged with or convicted of a violent crime prior to the current offenses. He described the charged incident in this case as an "isolated incident." He stated that during the prior uncharged incident the prosecution presented in this case, Rose "physically assaulted" him. He also noted he had been out of custody on bail for over a year without incident, and there were no new circumstances to indicate he would retaliate against Rose.

Ayala also asserted his military record demonstrates he "is not a threat to public safety" and "speaks to his upstanding character." He described his military record as follows: "He has been trusted and relied upon by some of the highest-ranking members of the United States Army during his 5 years of service.

11

He enlisted at age 19, following in his parents' footsteps as a protector of the weak and vulnerable. He is a well-decorated officer, having received the Global War on Terrorism Expeditionary Medal and Service Medal, Army Good Conduct Medal, Iraq Campaign Medal with Campaign Star, Driver and Mechanic Badge w/ Driver-Wheeled Vehicles, National Defense Service Medal, Army Commendation Medal, Army Achievement Medal, and two Army Service Ribbons. He was also recognized for his service in a Designated Imminent Danger Pay Area. He was honorably discharged for medical reasons in 2012." He attached to his sentencing memorandum documents evidencing his military achievements.

Ayala also listed in his sentencing memorandum other circumstances in mitigation that he argued demonstrated he was "on a path of self-improvement." First, he "acknowledged the severe impact his PTSD has had on his ability to grapple with external stressors," and he stated he was meeting with a therapist two times per week to address the issue. Second, he indicated he had "shown remorse for how his actions have affected, and will affect, his baby boy." He wanted "to be a reliable father figure" for his son, and he explained his son was his "motivation for leading a law-abiding life." He pointed out that another general objective of sentencing is "[e]ncouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses." (Rule 4.410(a)(3).) Third, he informed the trial court he had recently enrolled in an online law school program through Arizona State University. He attached to his sentencing memorandum evidence of his enrollment.

Ayala also attached to his sentencing memorandum letters attesting to his good character from a former girlfriend, a

military veteran with whom he was stationed in Iraq, two friends, his cousin, his brother, and his uncle. He also included a letter he had written to the trial court before the preliminary hearing, describing his family's service in the United States Army (his and that of his mother, stepfather, and younger brother), and denying he "hurt [Rose] in any way" during the charged incident.

## B.    Ayala's motion under section 1170.9

At a hearing on September 5, 2019, the trial court and the parties agreed Ayala was statutorily eligible for probation. The court continued sentencing to allow Ayala to present further information regarding his PTSD diagnosis and its relation to his commission of the current offenses. The court also allowed Ayala's mother to give a statement on Ayala's behalf because she was on active military duty and would be deployed overseas at the time of the continued sentencing hearing. Ayala's mother stated a "federal doctor" had diagnosed Ayala with PTSD and depression. She emphatically denied Ayala had ever "hit anyone," including Rose, but she admitted he would break and hit "stuff." She urged the court to grant probation, stating she knew Ayala would not hurt Rose because he still loved her. She also stated Ayala cared about his children and wanted to take care of them.[8]

On December 16, 2019, after additional continuances of the sentencing hearing for Ayala to obtain information about his PTSD, Ayala filed a "Motion to Stay Custody in Lieu of Treatment," pursuant to section 1170.9. Therein he asserted he

---

[8] In addition to his child with Rose, Ayala had children from other relationships.

13

committed the offenses in this case "as a result of his PTSD, and/or other mental health problems, stemming from his service on the front lines during the Iraq and Afghanistan war." In addition to the information he stated in his sentencing memorandum regarding his military service, as summarized above, he explained: "He was deployed to Iraq for 15 months as part of Operation Iraqi Freedom war campaign, where he was in constant imminent danger of serious harm or death. Mr. Ayala's job was to drive vehicles in war zones, carrying cargo and soldiers. He also provided security for US installations and was attached to an Army Ranger unit. Rangers are [a] highly trained, rapid-response special forces combat group. [Citations.] Mr. Ayala was later stationed at Guantanamo Bay, where he served as a guard for incarcerated war criminals. [Citations.] He was medically retired and honorably discharged in 2012 due to trauma-related medical health and physical injuries, which he incurred while on active duty in combat theatre. [Citation.]" In support of these statements, Ayala cited to service-related documents attached to his motion.

Ayala also described in his motion his history of PTSD, citing to reports from psychological evaluations attached to the motion, and explaining: "Mr. Ayala reported to his doctor in 2012 that he began experiencing symptoms [of] insomnia, anxiety, depression and PTSD three years prior, in 2009, as a result of an incident in Iraq, during which Mr. Ayala witnessed an enemy explosive detonate near one of the vehicles in his caravan, badly injuring his friend and killing other soldiers. [Citation.] Mr. Ayala recalled having to pick up soldiers' body parts after this incident and having to clean the blood of soldiers whom he knew off the vehicles. [Citation.] He witnessed multiple soldiers,

14

whom he knew, killed in action by IEDs, RPGs [rocket-propelled grenade] and mortar blasts. [¶] Notably, Mr. Ayala had to be constantly vigilant while doing his job as the driver of military vehicles carrying soldiers and cargo in areas of combat. Consequently, he reported noticing an exaggerated startle response and increased hypervigilance in his civilian life, especially while out in public and while driving, due to his experience with Improvised Explosive Devices (IEDs). [Citation.]" Ayala explained that his condition was initially "diagnosed as insomnia," so he did not receive treatment for PTSD, and "his symptoms continued to worsen over time." After this case was filed, he "began attending PTSD combat vet groups every two weeks" and "started seeing benefits from such therapy." He "now accepts full responsibility for his actions and shows extreme remorse for breaking the law." Pursuant to section 1170.9, he requested the trial court order a specific treatment program provided by the Department of Veterans Affairs, as outlined in his motion.

Ayala attached to his motion, among other exhibits, a report prepared after a December 5, 2019 psychological evaluation arranged by his trial counsel. In the 11-page report, the examiner, a clinical psychologist, concluded "it is probable that [Ayala]'s behavior [in commission of the charged offenses] is best explained by chronic, combat-related PTSD, rather than to a [*sic*] reckless disregard for the welfare of others." The examiner also stated in the report: "It is determined based on this forensic, medical-psychological examination [including a Trauma-Related Guilt Inventory scale] that Mr. Ayala's mood is particularly, negatively affected by the emotional injury to the victim in this

15

case and as such, he experiences emotional guilt and remorse related to this incident."

### C.    Sentencing hearing

At the December 31, 2019 sentencing hearing, the trial court stated it had "read and considered the entire file," including the probation report, the sentencing memoranda, the letter from Rose, the letters attesting to Ayala's good character, and the oral statement from Ayala's mother.  Regarding Ayala's "Motion to Stay Custody in Lieu of Treatment," the trial court stated: "[W]ith respect to the filing by the defense under Penal Code section 1170.9, the court makes the following determination as required by statute.  I find that the defendant was serving as a member of the United States military, and I also find that the defendant has suffered from a post-traumatic stress disorder as a result of his service.  [¶]  The court recognizes its discretion to request an assessment to aid in this determination.  The court makes a specific factual finding that the information presented by the defense as well as the appropriate information available to me at this juncture of the proceedings is adequate and that no further inquiry is necessary to impose a fair and equitable sentence."

Next, Ayala made the following statement to the trial court: "I've thought about this the last four months, Your Honor -- the clerk and the court reporter, I just want to say that I'm deeply -- I more than apologize.  I'm truly sorry for the audio that we all had to go through, which terrifying, is not my character -- it was horrible.  It was not of my character at all.  I've apologized to myself, and I definitely apologized to my wife -- I -- sorry.

"I did -- I joined the military at a young age, and both of my parents are military, as you've seen, which have come [*sic*] many

16

times. I've never had to show remorse. It was just 'yes, sir,' 'no, sir.' And so if, on the stand, [the prosecutor] or my lawyer, if I didn't show that remorse, I apologize because I know 'yes' or 'no' answers. I do apologize for everything that took place between me and my wife, and it shouldn't have happened in that setting or even if public.

"I'm a man of my word. I joined the military. I have multiple degrees. And I've served my community in both cities very well. I help veterans get off the streets. I help them get clothing and have a second chance at life. I had a bad day in judgment, which had a bad turn for my life. I'm 31 years old. I take care of all my kids financially. And I just want to have a second chance to get back out there and show what I can do in the community. I'm nowhere near a flight risk or a threat. I showed up to your courtroom every time proper, Your Honor.

"I just had -- had bad -- a bad day that day, and I just want to say I'm truly sorry for everything, Your Honor."

Defense counsel added that "from the beginning" of his representation of Ayala, he noticed Ayala "was struggling with his [PTSD] to the point where he [Ayala] was denying it." Counsel stated: "I think it finally dawned on him – or it was clear to him that he is suffering from [PTSD], and he is not functioning as a normal person in society, once this was all said and done and he was taken into custody and started going to [PTSD] groups." Counsel urged the trial court to order treatment in lieu of incarceration, arguing "this is the perfect case for [application of section] 1170.9."

The prosecutor briefly summarized the facts of the charged incident and argued "there is nothing demonstrated by [Ayala's] conduct that day that indicates that his actions had anything to

17

do with his [PTSD] or his prior service." The prosecutor also stated he believed a sentence of seven years and eight months was appropriate given the aggravating factors set forth in the prosecution's sentencing memorandum and the probation report, as summarized above.

In ruling on Ayala's motion under section 1170.9, the trial court stated it found "two very powerful and probably more mitigating circumstances" in this case: (1) Ayala's minimal criminal record; and (2) the "statutory mandate that his military service under the circumstances of this case be considered as a factor against incarceration and favorable to probation." The court also commented on Ayala's family and community support, which the court characterized as "circumstantial evidence that encourage[d] the court to feel that he may succeed on probation."

Next, the trial court commented on factors it believed weighed against granting probation in this case. The court noted Rose was "an innocent victim of this crime [*sic*] who was seven months pregnant, [and] terrorized and threatened with a handgun." The court also expressed concern about the whereabouts of Ayala's handgun, stating it was not satisfied with Ayala's representation that he sold the gun to a military man in Florida, who later resold it.

The trial court also commented: "I've spent a considerable amount of time with Mr. Ayala, both in pretrial proceedings, [and] throughout trial. I've listened to his testimony. I've watched how he responded to various conditions of his bail, and the totality of his behavior is disturbing. He has said, really for the first time, today[,] that he's sorry, that he recognizes what he did was wrong. But his behavior in this case, really almost from start to finish, belies it, in my view." The court also stated it did

18

not believe Ayala's PTSD diagnosis "explain[ed] the totality of his behavior": "There's something going on with him that's more than that that's deeply troubling. That, in my view, has to be considered along with what we owe him as a result of his military service."

The trial court declined to place Ayala on probation, finding "there would not be a likelihood that [he] would succeed" on probation. After "[b]alancing" the mitigating and aggravating facts of the case, including Ayala's service-related PTSD, the court explained: "The court finds that the defendant has shown no credible remorse in any way within the meaning of rule 4.414(b) in this connection [*sic*]. The court and jury listened carefully to his explanation at trial as to how the victim's injuries occurred. The court finds it unconvincing, and apparently, the jury did so as well. [¶] Since his conviction, he has not expressed remorse or sympathy for the victim in any way that the court finds credible. And as an independent and separate reason to deny probation, as I mentioned before, the victim was pregnant and vulnerable at the time of . . . the criminal threat and use of a gun."

In selecting the upper term of three years for the criminal threats (the principal term), the trial court stated, in full: "The court has considered mitigating facts relating to the defendant and the crime as set out in rule 4.423(a) and (b) and 4.408. The court has also considered the following aggravating facts relating to the crime and the defendant. As set forth in rule 4.421, the defendant's convictions are of increasing seriousness, and the defendant engaged in a violent conduct [*sic*] that involved a threat of great bodily harm."

19

The trial court expressly declined to strike the firearm enhancement under section 12022.5, subdivision (a) because Rose was "terrified and intimidated" and Ayala's "threat to shoot her in connection with ready access to a weapon which he has been trained to use effectively is sufficient to justify the enhancement." The court imposed the low term of three years for the firearm enhancement because "this is the first weapons offense that has been committed by the defendant."

The trial court rejected the prosecution's recommendation that the court impose consecutive terms for the corporal injury upon a spouse and vandalism offenses. Instead, the court imposed concurrent terms. Thus, Ayala's sentence is six years in state prison.

## II. The Trial Court Did Not Abuse Its Discretion in Declining to Sentence Ayala to Probation

As set forth above, section 1170.9 requires a trial court to consider a defendant's PTSD stemming from service in the United States military as a factor in favor of granting probation. (§ 1170.9, subds. (a) & (b).) We review a trial court's sentencing decision under section 1170.9 for abuse of discretion, "evaluating whether the court exercised its discretion 'in a manner that is not arbitrary and capricious, that is consistent with the letter and the spirit of the law, and that is based upon an "individualized consideration of the offense, the offender, and the public interest." ' " (*People v. Panozo* (2021) 59 Cal.App.5th 825, ___ [274 Cal.Rptr.3d 59, 68].)

In this case, the trial court expressly found Ayala suffered from PTSD stemming from his service in the United States military, and the trial court expressly acknowledged that Ayala's service-related PTSD was a factor in favor of granting probation.

20

After weighing mitigating and aggravating circumstances, including Ayala's service-related PTSD, the trial court declined to grant probation for reasons it explained on the record, as summarized above. The trial court complied with section 1170.9 and did not abuse its discretion in declining to grant probation.

Ayala argues the trial court erroneously relied on lack of remorse as an aggravating factor and, without this factor, the circumstances "weighed in favor of probation and treatment under section 1170.9." In support of this argument he asserts: (1) the trial court's finding that he lacked remorse "is belied by [his] statement at the sentencing hearing"; and (2) the "trial court's focus on [his] lack of remorse during the trial was misplaced" because he "should not be punished for exercising his right to testify on his own behalf." We reject Ayala's assertions. The trial court did not find Ayala's expression of remorse at the sentencing hearing to be credible, under all the circumstances of the case, and we have no cause to disturb that credibility determination. Moreover, in evaluating Ayala's remorse, the trial court did not err in considering Ayala's trial testimony and his characterization of the charged incident, made while the prosecution played the audio recording of the incident. We note that during his testimony, Ayala admitted that he threatened to shoot Rose in the face and that he vandalized her property.

The trial court weighed the circumstances in mitigation and aggravation, including Ayala's service-related PTSD, and declined to place Ayala on probation. The record shows no abuse of discretion in that sentencing decision.

21

## III. The Trial Court Abused Its Discretion in Imposing an Upper Term Sentence

As set forth above, section 1170.91 *requires* a trial court to consider a defendant's service-related PTSD as a circumstance in mitigation when deciding which term—lower, middle, or upper—to impose for an offense. (§ 1170.91, subd. (a); *People v. Panozo, supra*, 59 Cal.App.5th at p. ___ [274 Cal.Rptr.3d at p. 67].) Section 1170.91, subdivision (a) "provides that a sentencing court 'shall consider' the defendant's qualifying service-related condition 'as a factor in mitigation' when selecting the appropriate determinate term." (*Panozo*, at p. 67.) There is no indication in the record before us that when the trial court imposed the upper term sentence for criminal threats, the court understood its obligation to consider Ayala's service-related PTSD as a factor in mitigation.

" 'A failure to exercise discretion may also constitute an abuse of discretion.' [Citation.] ' "A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record." ' " (*People v. Panozo, supra*, 59 Cal.App.5th at p. ___ [274 Cal.Rptr.3d at p. 68].)

The record demonstrates the trial court understood its obligation under section 1170.9 to consider Ayala's service-related PTSD as a factor in favor of granting probation in this case. The court repeatedly cited to section 1170.9 and made express findings of fact related to the question of probation. Once the court made the determination that it would sentence Ayala to prison, rather than place him on probation, there was no further discussion of his service-related PTSD. There was no mention by

22

the court or the parties of section 1170.91, and no mention of the trial court's separate obligation under that statute to consider Ayala's service-related PTSD as a circumstance in mitigation when imposing a term.[9]

In imposing the upper term for the criminal threats, the trial court stated it had "considered mitigating facts relating to the defendant and the crime as set out in rule 4.423(a) and (b) and 4.408," and had considered "aggravating facts relating to the crime and the defendant . . . [a]s set forth in rule 4.421." While rule 4.423(b)(2) generically lists a defendant's "mental or physical condition that significantly reduced culpability for the crime" as a circumstance in mitigation, it does not specifically require the court to consider a defendant's service-related PTSD as a circumstance in mitigation, as section 1170.91 does.

The trial court's consideration of Ayala's service-related PTSD for purposes of placing him on probation does not necessarily translate to the consideration of his condition for purposes of imposing a term. It is clear from the record the court believed it was not appropriate for Ayala to entirely avoid prison time for his crimes in favor of probation. It is *not* clear from the record, however, that the court would have imposed an upper term sentence for the criminal threats if it had considered Ayala's service-related PTSD in light of section 1170.91. As the court was aware, 31-year-old Ayala had a minimal criminal record, consisting entirely of a 2011 out-of-state conviction for driving

_____

[9] The Attorney General's argument that Ayala forfeited this issue by failing to raise it below is misplaced here where the record indicates the trial court's "apparent misapprehension of statutory sentencing obligations." (*People v. Panozo*, *supra*, 59 Cal.App.5th at p. ___ [274 Cal.Rptr.3d at pp. 70-71].)

under the influence and a 2012 out-of-state conviction for driving with a suspended or revoked license.  A clinical psychologist found it probable that Ayala's service-related PTSD influenced his behavior in the charged incident.  Based on the record before us, we conclude remand is necessary for the trial to make a sentencing determination in light of its obligation under section 1170.91.  (*People v. Panozo*, *supra*, 59 Cal.App.5th at p. ___ [274 Cal.Rptr.3d at p. 71] ["In short, our record necessitates remand because it is, at the very least, ambiguous as to whether the trial court was aware of its statutory obligations under sections 1170.9 and 1170.91"].)

## DISPOSITION

The matter is remanded for a new sentencing hearing at which the trial court shall satisfy its statutory obligations under section 1170.91.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24